*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KYLE GRAZIER,

　　　　　Plaintiff-Appellee,

v

WILLIAM G'SELL,

　　　　　Defendant-Appellant.

UNPUBLISHED
May 26, 2022

No. 356465
Washtenaw Circuit Court
LC No. 19-000117-DO

Before: MURRAY, P.J., and SAWYER and M. J. KELLY, JJ.

PER CURIAM.

Defendant, William G'Sell, appeals as of right from a judgment of divorce. For the reasons stated in this opinion, we affirm the court's entry of the judgment of divorce and its decision regarding the property distribution, but we reverse the court's denial of G'Sell's request for spousal support and attorney fees and remand for further proceedings.

## I. BASIC FACTS

In January 2019, plaintiff, Kyle Grazier, filed a complaint for divorce, asking for the trial court to dissolve the parties' marriage. A bench trial was held over seven days, beginning in June 2020 and ending on September 1, 2020. The parties gave very different accounts of the marriage. According to Grazier, G'Sell was unsympathetic about the debilitating effects that she suffered from a 2014 car accident. She testified that he engaged in sex acts on her even though they caused her pain and that he stopped helping around the house even though her medical condition left her skin extremely sensitive to touch and interfered with her ability to do simple household chores. She added that he verbally and physically abused her, kept a spreadsheet of her cell phone calls, and developed a recordkeeping system that she could not easily use to access information about her various accounts. She also testified G'Sell abused marijuana and alcohol.

According to G'Sell, he had abandoned his career aspirations to help Grazier pursue her dreams. He devoted himself to his family, took care of all the household chores, maintained the cars, and managed the family's finances. G'Sell denied forcing himself on Grazier sexually, and he called into question Grazier's testimony about her health by admitting into evidence nearly 100

-1-

vacation photographs in which the couple appeared to be happy and healthy. G'Sell also insisted that Grazier had an affair.

After the parties submitted their proposed findings of fact and conclusions of law, the trial court issued its opinion and order. Making findings under the factors in *Sparks v Sparks*, 440 Mich 141; 485 NW2d 893 (1992), the court found that Grazier was 69 years old, G'Sell was 70 years old, they had been married 37 years, and they both had issues with their health. The court observed that the marital estate resulted substantially from the efforts of Grazier, who had worked continuously throughout the parties' marriage and had also contributed substantially to raising the parties' children. The court found that G'Sell also made significant contributions in child rearing and had managed the family's finances. The court observed that they had lived frugally and conservatively during the marriage and that both lived in debt-free homes. As to their earning abilities, the court noted that both parties were of retirement age and could live off retirement savings. The court found credible Grazier's complaints of verbal and physical intimidation during the marriage and of G'Sell's abuse of alcohol and marijuana. The court also found G'Sell at fault for the breakdown of the marriage.

The trial court awarded Grazier the house in which she lived, valued at $470,000, and awarded G'Sell the house in which he lived, valued at approximately $160,000. The court ordered G'Sell to be responsible for the tax liability arising from his withdrawal of funds to purchase his house. To equalize the real estate awards, the court awarded G'Sell an extra $272,000 from the investment accounts. The court awarded the parties their respective vehicles and their separate bank accounts; joint bank accounts were to be divided equally and closed. Each party was responsible for the credit cards in his or her name as well as for any unpaid debt incurred on joint accounts since the filing of the complaint. After deducting the $272,000 equalizer from certain of the investment accounts, their remaining value was to be divided equally; the remaining retirement accounts were also to be divided equally. The court provided for the disposition of personal property and declined to award spousal support and attorney fees to either party. As to spousal support, the court ordered it forever barred. The trial court ordered Grazier to submit a judgment of divorce consistent with the court's opinion and order within 30 days.

Plaintiff moved for entry of the proposed judgment of divorce on December 3. G'Sell opposed the motion, and, initially, the trial court scheduled a hearing on Grazier's motion for entry of the judgment. However, after notifying the parties, the court entered the proposed judgment. G'Sell subsequently moved for relief from the judgment. The court denied the motion.

## II. ENTRY OF THE JUDGMENT OF DIVORCE

### A. STANDARD OF REVIEW

G'Sell argues that the trial court committed clear legal error by entering the judgment of divorce without consideration of the seven-day rule. Generally, this Court reviews allegations of procedural error by the trial court to determine whether refusal to act would be "inconsistent with substantial justice." MCR 2.613(A).

## B. ANALYSIS

G'Sell asserts that at the hearing on his motion for relief from judgment, the trial court "fail[ed] to even acknowledge the seven-day rule and grapple with the violation of it." MCR 2.602(B)(3), the so-called seven-day rule, allows a party to

> serve a copy of the proposed judgment or order on the other parties, with a notice to them that it will be submitted to the court for signing if no written objections to its accuracy or completeness are filed with the court clerk within 7 days after service of the notice.

A party seeking to have a proposed judgment or order entered under the seven-day rule must do so "[w]ithin 7 days after the granting of the judgment or order, or later if the court allows . . . ." MCR 2.602(B)(3). Grazier, however, did not seek entry of the proposed judgment under the seven-day rule. Indeed, G'Sell acknowledged as much both in his motion for relief from judgment and at the hearing on that motion. Nevertheless, G'Sell asserts, without explanation or citation to authority, that by moving for entry of the proposed judgment, the seven-day rule was nevertheless "triggered." Assuming *arguendo* that the rule was, in fact applicable, no violation of MCR 2.602(B)(3) occurred. The seven-day period started on December 4, the day after she filed her motion, and ran until the end of the day on December 10. See MCR 1.108(1). G'Sell filed his response to her motion on December 11, the eighth day. Therefore, even if the seven-day rule was applicable, no violation of it occurred.

## III. PROPERTY DIVISION

## A. STANDARD OF REVIEW

G'Sell next argues that the property division was inequitable. When reviewing a trial court's property division, we first review the court's findings of fact for clear error. If the findings are upheld, we then determine whether the "dispositive ruling was fair and equitable in light of those facts." *Sparks*, 440 Mich at 151. We affirm the trial court's ruling unless we are "left with a definite and firm conviction that the division was inequitable." *Id*.

## B. ANALYSIS

## 1. TAX PENALTY

G'Sell first argues the property division was inequitable because the trial court erred by ordering him to be solely responsible for the tax penalty incurred when he withdrew $160,000 from a retirement fund. We disagree. Prior to trial, Grazier asked the court to enter an ex parte mutual restraining order prohibiting the parties from dissipating the marital estate. Thereafter, the court entered an order prohibiting the parties from "selling, transferring, encumbering, concealing, giving away or somehow otherwise disposing of any property or assets belonging to the parties and/or to the Plaintiff or Defendant, except for necessities, or other transactions mutually agreed upon in writing by the parties." The order covered "[b]ank accounts or any other financial account of any kind in the name of either party individually or jointly" and "[r]etirement accounts owned by either party[.]" Subsequently, G'Sell withdrew $160,000 from a retirement account to make a

cash offer on a house. In doing so, he incurred a $38,014 tax penalty because he was unable to reimburse the account during the 60-day grace period. At trial, G'Sell testified that that he was aware of the ex parte mutual restraining order, and he acknowledged that he withdrew $160,000 from the retirement account without Grazier's consent or the court's permission. In light of G'Sell's testimony, we conclude that the trial court did not clearly err by finding that G'Sell used $160,000 of marital funds without Grazier's consent or the trial court's permission to purchase a house.

Moreover, G'Sell admitted at trial that he made several withdrawals from marital funds without prior approval, including the one at issue. Thus, the $160,000 withdrawal was part of a pattern of repeated violations of the trial court's mutual restraining order. In addition, the record does not support G'Sell's contention that he withdrew the money with the understanding that the parties would avoid the penalty by using other funds from the marital property to reimburse the retirement account before expiration of the 60-day grace period. Instead, G'Sell's testimony at trial was that he withdrew the funds because he thought that the parties were within 60 days of reaching a settlement. He acknowledged that the move was risky because he knew that Grazier would not consent to reimbursing the retirement account. In light of the record, the property division was not rendered inequitable as a result of the court's order that G'Sell be solely responsible for the tax consequences of his withdrawal decision.[1]

## 2. ARBITRATION AWARD

Next, G'Sell argues that the trial court erred by concluding that an arbitration award from the car accident was Grazier's separate property.[2] Proceeds from a personal injury suit meant to

---

[1] G'Sell's attempts to ascribe fault for the tax penalty to others are also unpersuasive. G'Sell implies that requiring him to bear the burden of the tax penalty is inequitable because he withdrew the funds to purchase the house on the advice of a lawyer. Assuming that to be so, actions that violate a trial court's order are not less violative simply because they are taken on the advice of counsel. See *Brown v Brown*, 335 Mich 511, 518-519; 56 NW2d 367 (1953). G'Sell also argues that Grazier shares at least some of the responsibility for incurring the tax penalty because she unreasonably refused to use marital funds to reimburse the retirement account and avoid the penalty. He asserts that Grazier was obligated to reimburse the retirement account to minimize damage to the marital estate. In support, he directs this Court to *Januska v Mullins*, 329 Mich 606; 46 NW2d 398 (1951). *Januska* involved breach of a construction contract and the injured party's obligation to "make every reasonable effort to minimize the damages suffered." *Id*. at 613. The tax penalty in the present case did not arise from G'Sell's breach of a contract; however, so *Januska* is inapplicable.

[2] G'Sell contends that the trial court inequitably divided the parties' joint bank account by failing to consider that Grazier diverted her salary away from the joint account and into her personal account, resulting in an award $200,000 more than his. However, the basis for his argument is his assumption that the arbitration award was marital property. Thus, the court's division of the bank accounts and its determination that the arbitration award is Grazier's separate property are one issue.

-4-

compensate for pain and suffering are not joint marital property. *Pickering v Pickering*, 268 Mich App 1, 10; 706 NW2d 835, 841 (2005). However, "a personal injury settlement may be treated as marital property where the original action included a loss of consortium claim and the settlement check was made payable to both parties and treated by the parties as marital property." *Id*. at 11. G'Sell asserts that the present case is similar to *Pickering* and that the arbitration award was marital property because there was no breakdown of the award, the complaint included a claim for loss of consortium, and the check was written to both parties. However, in *Pickering*, evidence established that the proceeds of the settlement check were put into a joint account and "used to pay taxes, pay car insurance, pay the remainder of the home mortgage, purchase a family car, and pay off debt." *Id*. In the present case, Grazier testified that she deposited the proceeds from the arbitration award in a new account that she opened in her name, and there is no record evidence that the proceeds were used for marital expenses. Accordingly, G'Sell has failed to establish that *Pickering* required the trial court to treat the arbitration award as marital property.

In light of the foregoing, we do not have "a definite and firm conviction" that the trial court's division of property was inequitable. Accordingly, we affirm the trial court's property disposition.

## IV. SPOUSAL SUPPORT

### A. STANDARD OF REVIEW

G'Sell next argues that the trial court erred by denying his request for spousal support. Whether to award spousal support is in the trial court's discretion, and this Court's review is for an abuse of that discretion. *Gates v Gates*, 256 Mich App 420, 432; 664 NW2d 231 (2003). The trial court's findings of fact regarding spousal support are reviewed for clear error. *Id*.

### B. ANALYSIS

MCL 552.13(1) authorizes a trial court to require either party in a divorce action to pay spousal support "for the suitable maintenance of the adverse party." Among the factors the court should consider when determining whether to award spousal support are the following:

> (1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. [*Loutts v Loutts*, 298 Mich App 21, 31; 826 NW2d 152 (2012) (quotation marks and citation omitted).]

"The trial court should make specific factual findings regarding the factors that are relevant to the particular case." *Myland v Myland*, 290 Mich App 691, 695; 804 NW2d 124 (2010) (quotation marks and citation omitted).

G'Sell challenges the trial court's decision on three grounds. First, he contends that the trial court's finding that the parties lived frugally and conservatively during the marriage is clearly erroneous because it "does not have any foundation." Grazier, however, testified that before filing for divorce, the parties lived "very frugally" and that she was "risk averse about spending money." G'Sell similarly testified that the parties spent conservatively during the marriage. Although G'Sell points out that the parties' travel itinerary from 2017 shows that they traveled extensively— with the parties paying for the vast majority of the costs—that evidence does negate the parties testimony that, during their 37-year marriage, they lived frugally and conservatively. The trial court did not clearly err by finding that the parties lived frugally and conservatively during their marriage.

Next, G'Sell contends that the court erred by denying his request for spousal support on the ground that Grazier was taking a sabbatical during the 2020-2021 academic year and would receive only half of her base salary. The trial court observed, as reflected by the trial testimony, that Grazier "would like the opportunity to not have to continue to work so hard and is on sabbatical with her employer at a reduced salary." The court's observations were relevant to the several spousal support factors, including Grazier's ability to pay spousal support and her present situation. See *Loutts*, 298 Mich App at 31. Thus, it was not erroneous for the court to consider it as a factor weighing against awarding G'Sell spousal support.

Lastly, G'Sell contends that the trial court erred by denying his request for spousal support on the basis that fault for the breakdown of the marriage was solely his. One of the elements that a trial court may consider when dividing marital assets or considering a request for spousal support is a party's fault in causing the divorce. *Id*. Addressing the proper consideration of fault in *Hanaway v Hanaway*, 208 Mich App 278, 297; 527 NW2d 792 (1995), this Court explained:

> The relative value to be given the fault element in a particular case and the extent to which particular actions are regarded as fault contributing to the breakdown of a marriage are issues calling for a subjective response; such matters are left to the trial court's discretion subject to the requirement that the distribution not be inequitable. The trial court is in the best position to determine the extent to which each party's activities contributed to the breakdown of the marriage.

In the present case, the parties testified extensively throughout a seven-day bench trial, during which the court had the opportunity to observe each party's memory and manner while testifying, as well as to consider the reasonableness of their testimony in light of the other evidence submitted. Thereafter, the court found Grazier's testimony about verbal and physical abuse more credible than G'Sell's testimony. On the basis of this credibility assessment, the trial court found G'Sell at fault for the breakdown of the marriage. "In reviewing a trial court's factual findings, this Court should defer to the trial court's determination of credibility." *Moote v Moote*, 329 Mich App 474, 478; 942 NW2d 660 (2019). Accordingly, we conclude that the trial court's finding that G'Sell was at fault for the breakdown of the marriage is not clearly erroneous.

We must next decide whether the trial court's denial of spousal support to G'Sell was fair and equitable in light of the facts. *Gates*, 256 Mich App at 433. "Spousal support is intended to balance the income and needs of the parties so that neither party will be impoverished as a result of the divorce." *Id*. at 436. "[W]here both parties are awarded substantial assets, the court, in

evaluating a claim for [spousal support], should focus on the income-earning potential of the assets and should not evaluate a party's ability to provide self-support by including in the amount available for support the value of the assets themselves." *Hanaway*, 208 Mich App at 296.

Apart from two houses and two cars, the bulk of the marital estate consists of bank accounts, investment accounts, and retirement accounts. Neither the judgment of divorce nor the trial court's opinion indicate the value of the investment and retirement accounts, nor does the record indicate the total value of G'Sell's award or addresses the income-generating potential of the assets he received and whether that income is available for his current expenses. The trial court abused its discretion by failing to make findings regarding G'Sell's need for spousal support. See *Olson v Olson*, 256 Mich App 619, 634; 671 NW2d 64 (2003).

In addition, the trial court said that neither party should be accountable to the other for income that they earn after they reached retirement age. The trial court did not cite any authority for this general proposition, nor have we found any. Grazier's testimony indicates that she would continue to obtain employment income through the 2021-2022 academic year, after which she plans to retire. As to G'Sell, the record is clear that he depended on Grazier's income throughout the marriage. G'Sell also made contributions to the marriage that allowed Grazier to achieve professional success, including contributing to child rearing, household chores, and managing the family's finances. If Grazier continues to receive income by working at a position that G'Sell's contributions during the marriage helped make possible, G'Sell may be entitled to modifiable support from her employment income if he needs support, if she has the ability to pay support, and if an order of spousal support would be equitable. Because the court did not make findings regarding his need and about the income-generating potential of his award, we are precluded from conducting a meaningful review of whether the denial of G'Sell's request for spousal support was equitable under the circumstances. See *Woodington v Shokoohi*, 288 Mich App 352, 366-367; 792 NW2d 63 (2010).

For the foregoing reasons, we affirm the findings of fact that G'Sell challenges, but reverse the denial of his request for spousal support and remand the matter for further findings and clarification relevant to the basis of court's decision regarding spousal support.

## V. ATTORNEY FEES

### A. STANDARD OF REVIEW

G'Sell next contends that the trial court erred by denying his motion for attorney fees because Grazier's income is 15 times that of his and she has the ability to pay all or part of his attorney fees. This Court reviews a trial court's decision whether to award attorney fees for an abuse of discretion, its findings of fact for clear error, and its conclusions of law de novo. *Loutts*, 298 Mich App at 24.

### B. ANALYSIS

MCR 3.206(D)(1) authorizes a party to a divorce action to request the trial court to order the other party to pay all or part of the party's attorney fees and expenses. The party seeking attorney fees and expenses must allege facts sufficient to show either that "the party is unable to

bear the expense of the action . . . and that the other party is able to pay," MCR 3.206(D)(2)(a), or that "the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of [the court] rules," MCR 3.206(D)(2)(b). "The party requesting the attorney fees has the burden of showing facts sufficient to justify the award." *Id*. at 370. "It is well-settled that a party should not be required to invade assets to satisfy attorney fees when the party is relying on the same assets for support." *Woodington*, 288 Mich App at 370.

The trial court found that G'Sell had not shown an inability to pay his attorney fees because "[t]he award of marital property [was] sufficient to give [him] his attorney fees." However, because the trial court made no findings regarding G'Sell's need and total income, it is unclear whether the trial court meant that G'Sell's income was sufficient to pay his attorney fees or whether the court's ruling left him to pay his attorney fees out of an award intended for his support. Requiring G'Sell to pay his attorney fees out of an award intended for his support would be an abuse of discretion. See *id*. We conclude that the trial court's failure to make findings regarding G'Sell's need and the income-generating potential of his award precludes meaningful review of the trial court's denial of G'Sell's request for attorney fees. Accordingly, we reverse the trial court's denial of G'Sell's request for attorney fees and remand the matter to the trial court for findings of fact and clarification relevant to the basis of its decision.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Neither party may tax costs. MCR 7.219(A).

/s/ David H. Sawyer
/s/ Michael J. Kelly